## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAY GROSS, <u>et al.</u>,**<br><br>            Plaintiffs,<br><br>            v.<br><br>**STEPHEN C. WRIGHT, <u>et al.</u>,**<br><br>            Defendants. | Case No. 15-cv-01166 (CRC) |

### <u>MEMORANDUM OPINION</u>

As "a new community for a new sovereign," our nation's capital gave architectural expression to the budding ideals of American constitutional government. James Sterling Young, <u>The Washington Community, 1800–1828</u>, at 1 (1966). But while Pierre L'Enfant's blueprint for the city has endured, romanticism has yielded to reality: The District is a burgeoning metropolitan center striving to compete in the global economy. Like most cities, it endeavors to preserve its historical, cultural, and aesthetic heritage while adapting to the ever-changing demands of urban living. An entire chapter of the D.C. Code is therefore dedicated to reconciling economic growth with the protection of historic properties.

Defendants in this case, under the auspices of historical preservation, petitioned the local government to halt a property developer's planned renovation of a rowhouse in Washington's upward-trending Petworth neighborhood. The developer insists that two of these Defendants, who themselves profit from real-estate dealings and property improvements, are fair-weather conservationists exploiting local laws to drive him out of business. He brings several common-law tort claims that one would expect to find in a local development dispute. But he has also (literally) made a federal case out of this largely interpersonal feud by including a claim under the Sherman Antitrust Act, 15 U.S.C. § 1, contending that Defendants' actions have

unreasonably restrained trade in the market for renovation properties in Washington, D.C.

Because the Sherman Act protects "competition, not competitors," Brown Shoe Co. v. United

States, 370 U.S. 294, 320 (1962), and Plaintiffs have not plausibly pled a marketwide

anticompetitive injury, the Court will grant Defendants' motion to dismiss Plaintiffs' Sherman

Act claim.  And because the case is still at an early stage and involves questions of D.C. law that

are best resolved by the local courts, the Court will decline to exercise supplemental jurisdiction

over Plaintiffs' common-law claims.

### I.      Background

Plaintiff Jay Gross is a licensed real-estate agent who works to "renovate, remodel,

modernize and improve dilapidated properties in the District of Columbia."  Pls.' First Am.

Compl. ("Compl.") ¶ 26.[1]  In November 2014, Gross purchased a single-family rowhouse at 7

Grant Circle in the Petworth neighborhood of Washington, D.C. with the intention of renovating

it as a matter of right under the District's then-existing zoning regulations.  The planned

renovation involved dividing the home into three units, which required "raising the roof a small

amount."  Id. ¶ 29.  By this time, Gross also owned a nearby rowhouse at 15 Grant Circle, as

well as other investment property elsewhere in the city.  Gross's properties are held by LLCs

corresponding to the address of each property, eight of which are Plaintiffs in this case.[2]

---

[1]  For purposes of deciding the present motions, the Court accepts as true the Complaint's factual
allegations.  See Talenti v. Clinton, 102 F.3d 573, 575 (D.C. Cir. 1996).  Defendants, of course,
dispute Mr. Gross's version of events.

[2]  The eight co-Plaintiffs are 11th Property Group, LLC; 7 Grant Circle NW LLC; 14 Grant
Circle NW LLC; 15 Grant Circle NW LLC; 1524 Ogden St. NW LLC; 4511 Iowa Ave. NW
LLC; 1201 Kenyon St. NW LLC; and 3223 11th St. NW LLC.  Each of them lists Gross's
address as its principal place of business.  Gross did not acquire the property at 14 Grant Circle
until April 2015.

Defendants Stephen Wright and Thomas Woodruff reside at 6 Grant Circle, which shares a wall with Gross's property at 7 Grant Circle.  Wright is an architect and the managing partner of the Washington, D.C. office of Leo A Daly Company, an "architecture, planning, engineering, and interior design firm" that Gross has also named as a Defendant in this action.  Id. ¶ 20. According to the Complaint, Wright and Leo A Daly together "design, remodel, modernize and improve buildings in the District," thereby "compet[ing] directly with the Plaintiffs' business of buying properties [and] improving the structures."  Id. ¶ 33.  Defendant Woodruff is a real-estate agent, partner, and principal of the D.C.-based real-estate firm Central Properties, LLC, another Defendant in this case.  Woodruff and his employer are also alleged to "compete directly with Mr. Gross, a licensed real estate agent and landlord, by buying, selling, and renting residential properties throughout the District."  Id. ¶ 35.

While the main protagonists in this case own neighboring rowhouses, relations between them have been anything but neighborly.  Tensions flared in December 2014, when Gross began renovating the unit at 7 Grant Circle.  Gross contends that Wright and Woodruff had already "gut renovated" their own property by adding a second dwelling unit, id. ¶ 31, thereby exemplifying Wright's "personal mantra: 'I have little tolerance for people who hold onto the status quo. Change is neither good nor bad—it's inevitable,'" id. ¶ 1.  Wright nonetheless verbally "berat[ed]" Gross and "insult[ed] [his] plans for 7 Grant Circle."  Id. ¶ 40.  He purportedly attempted to "threaten and intimidate" Gross into abandoning his project, or at least to obtain Gross's building plans in order to "investigate ways to obstruct the improvements."  Id.  The reason, according to Gross?  Wright believed that Gross was "intruding on his pool of renovation projects," and Woodruff similarly concluded that Gross was "intruding upon the commissions in

his turf by purchasing directly from homeowners" and "competing in the residential rental market."  Id. ¶ 2.

      A.      <u>Defendants' Successful Historic-District Application for 4–33 Grant Circle</u>

According to Gross, Wright and Woodruff jointly devised a multi-pronged strategy to "snuff out Plaintiffs' competing business by freezing permitting and renovation at all of Plaintiffs' property all over D.C."  Id.  He contends that Wright and Woodruff knew that the D.C. Zoning Commission would soon decide whether to amend the District's zoning regulations to begin requiring permits to convert buildings like 7 Grant Circle into three-unit structures.  In the meantime, they endeavored to prevent Gross from altering his properties at 7 and 15 Grant Circle by petitioning D.C.'s Historic Preservation Office ("HPO") to declare 4–33 Grant Circle a historic district.[3]

In early January 2015, according to Gross, Wright and Woodruff initiated a "surreptitious campaign to foment animosity and resistance" to Gross's renovations among Grant Circle residents and members of the local Advisory Neighborhood Council ("ANC").  Id. ¶ 46.  They convened an ANC meeting at which they made "false and disparaging" claims about Gross and his projects.  Id. ¶ 47.  Gross claims that neither he nor the owner of 16 Grant Circle (another property undergoing alterations) was invited.  Later that month, Wright emailed an HPO employee to explain that he was "fearful and furious" about Gross's work in Grant Circle.  Id. ¶ 48.  Gross contends that Wright then requested an in-person meeting "to learn what we can do to slow the permitting process."  Id.  Five days later, Wright and Woodruff met with three D.C.

---

[3]  The mayor's office must issue a permit before the exterior of any building falling within a historic district may be altered.  D.C. Code Ch. 11, § 6-1105(a).

Office of Planning employees, where they again allegedly "made false claims about Plaintiffs and their work." Id. ¶ 49.

On February 13, 2015, Wright and Woodruff submitted an application to D.C.'s Historic Preservation Review Board ("HPRB") to designate the set of properties situated at 4–33 Grant Circle as a historic district. The application was authored by Defendants Oscar Beisert, an advocate for historical preservation who lent his expertise to Wright and Woodruff, and Off Boundary Preservation Brigade ("Off Boundary"), Beisert's nonprofit entity. Beisert and Off Boundary "specialize in making applications . . . to designate certain real properties as historic districts and/or historic landmarks." Id. ¶ 21. Gross alleges that Defendants gerrymandered their historic-district application to "a small portion of the periphery of Grant Circle" for the sole purpose of "obstruct[ing] Plaintiffs' projects in that area." Id. ¶¶ 51–52.

Next, according to Gross, Wright and Woodruff "orchestrat[ed] an exaggerated and false sense of unanimity" among Grant Circle residents. Id. ¶ 54. At an informal neighborhood meeting on February 23—of which neither Gross nor the pastor of an affected church had been notified—two D.C. Office of Planning employees highlighted the merits of the city's historical-preservation processes, as they had been recruited to do. The local ANC then met on March 11 to deliberate on Defendants' historic-district application. After Wright, Woodruff, and Beisert allegedly "drum[med] up support" among attendees by "making false representations about Plaintiffs and disparaging their projects," the ANC voted to express its support for the application. Id. ¶ 56.

On April 2, the HPRB held a public hearing on Defendants' historic-district application. Wright warned that Gross was engaged in "predatory development," and both Wright and Beisert are said to have exaggerated the level of support that the application had received among

neighborhood residents.  Id. ¶¶ 65–66.  According "great weight" to the ANC's nonbinding

recommendation, the HPRB formally granted Defendants' application to designate 4–33 Grant

Circle as a historic district.  Id. ¶ 67.  External alterations to these properties would thereafter

require prior governmental approval; Gross could no longer expand 7 and 15 Grant Circle as a

matter of right, regardless of what generally applicable zoning regulations might permit.

> B.    Defendants' Interim Historic-Landmark Applications for 7 and 16 Grant Circle

Gross also contends that Defendants implemented a more immediate means of stifling

development in Grant Circle.  In February 2015, before the HPRB approved their historic-district

application, they filed historic-landmark applications for 7 and 16 Grant Circle.  Under local law,

no structure for which a landmark application is pending may be altered without prior mayoral

approval.  D.C. Code Ch. 11, §§ 6-1102(6)(B), 6-1105(a).  So Defendants' landmark applications

temporarily halted matter-of-right improvements to both properties—which Gross and the owner

of 16 Grant Circle were preparing to undertake—until the historic district's approval did so

permanently.

Gross maintains that Defendants did not actually intend for their landmark applications to

succeed:  They knew that 16 Grant Circle was "neither architecturally nor culturally significant"

and "did not merit a landmark designation."  Compl. ¶ 73.  The same was true of Gross's

property at 7 Grant Circle, given its status as "a ubiquitous and entirely indistinct rowhouse."  Id.

¶ 76.  Even before Defendants filed these two historic-landmark applications, Gross alleges, D.C.

government officials had told them that their efforts were "desperate" and "a stretch."  Id. ¶ 74.

Beisert responded, "Well, how much time will this nomination buy me?"  Id.  Defendants'

landmark applications rendered the owners of 7 and 16 Grant Circle "unable to . . . continue their

work at their properties."  Id. ¶ 77.

The HPRB held a public hearing on the 16 Grant Circle application on March 26, 2015.
In advance of the hearing, the HPO recommended that Defendants' application be denied; at the
hearing itself, an Office of Planning employee testified that 16 Grant Circle was "not an outlier
in either Petworth or the city." Id. ¶ 86.  At the close of discussion, the Board unanimously
denied the application.  This action left little hope that Defendants' historic-landmark application
for 7 Grant Circle would be approved.  Yet they failed to withdraw it until after the surrounding
historic district had been finalized, at which time the zoning regulations' matter-of-right regime
ceased to govern 4–33 Grant Circle.  Even so, the HPO released the report it would have
submitted to the HPRB, recommending that the 7 Grant Circle application be denied:  "The
landmark application claims too great an architectural significance for this single building—
oddly without nominating its attached twin, 6 Grant Circle, which shares much of its history and
character." Id. ¶ 90.  Under the cover of D.C.'s historical-preservation laws, according to Gross,
Defendants thus "accomplished their real goal of . . . freez[ing] all progress toward permitting at
[7 Grant Circle]." Id. ¶ 91.

C.     Defendants' Other Efforts to Obstruct Plaintiffs' Businesses

For the third prong of Defendants' "attack on Mr. Gross and his competing businesses,"
Gross alleges that they embarked on a campaign of deception to thwart his plans on Grant Circle
and elsewhere. Id. ¶ 92.  The historic-district application's acceptance did not entirely preclude
Gross from renovating his Grant Circle properties, merely from doing so without prior
governmental approval.  Wright and Woodruff therefore allegedly set out to block or rescind the
issuance of permits for Gross's properties.

Gross obtained permission to alter 7 Grant Circle soon after the historic district's
designation.  The Complaint quotes an email from Woodruff registering his disapproval to two

7

Office of Planning employees:  "Looks like they are going to issue the permits for 7 Grant Circle

. . . . We may be the first historic district in history to ask for the designation to be removed.

(cause there is really no point when 20% of the property in a district is already 'compromised')."

Id. ¶ 71.  According to Gross, Wright and Woodruff responded by hiring an engineering

company to "draft a report fabricating alleged shortcomings" with Gross's work at 7 Grant

Circle, and to "manufacture purported architectural flaws in [his] plans."  Id. ¶ 98.  Armed with

this document, the two men met with a D.C. Department of Consumer and Regulatory Affairs

("DCRA") employee, charging that Gross and his LLCs "conduct their business illegally and

violate D.C. building law."  Id. ¶ 99.  Wright and Woodruff, Gross claims, also allegedly

"misrepresented" to the DCRA that he had failed to share with them his underpinning plans for 7

Grant Circle.  Id. ¶ 102.  Their efforts succeeded—the DCRA revoked Gross's building permit

for 7 Grant Circle on May 4.

According to Gross, Wright and Woodruff soon "expanded their plan to properties owned

by Plaintiffs throughout the District."  Id. ¶ 112.  Wright emailed two DCRA employees on May

11, attaching the engineering report he and Woodruff had commissioned.  In the body of the

email, he insisted that

> [t]he architectural review reveals a continuing pattern by this developer of
> misleading DCRA reviewers to achieve his ends. . . . [W]e strongly suggest that the
> other properties which are under permit review, are under construction, or have
> recently been redeveloped by Mr. Gross and his design team be reviewed for
> possible incomplete or misleading drawings.

Id. ¶ 101.  Similarly, Wright and Woodruff contacted the neighbors of three of Gross's other

properties—1201 Kenyon Street NW, 4511 Iowa Avenue NW, and 1524 Ogden Street NW—and

allegedly "made false claims" that Gross and his LLCs "do not perform legal work."  Id. ¶¶ 107,

109, 111.  After these overtures, neighbors of 1201 Kenyon Street and 4511 Iowa Avenue

"began complaining to Mr. Gross about development" and "attempted to obstruct [his] work there." Id. ¶¶ 108, 110.  The Complaint does not state whether any development has actually been impeded outside Grant Circle as a result of Defendants' actions.

Gross lastly alleges that Woodruff attempted to interfere directly with Gross's purchase of 14 Grant Circle from its previous owner because Woodruff "wanted the commission for himself and his company" and desired to "obstruct Mr. Gross and his businesses from obtaining another project." Id. ¶ 95.  On April 26, Woodruff emailed 14 Grant Circle's owner to urge him—unsuccessfully—to renege on the contract he had concluded with Gross and "either sell the house to him or to another buyer through him." Id. ¶ 96.

D.   Plaintiffs' Claims

Gross and his LLC co-Plaintiffs filed their First Amended Complaint on September 21, 2015.  They have sued Wright, Woodruff, Leo A Daly Company, Central Properties,[4] Beisert, and Off Boundary Preservation Brigade for their alleged "systematic disruption of the Plaintiffs' business . . . all over the District of Columbia." Id. ¶ 1.  Plaintiffs' Complaint includes six counts: one federal-law claim and five D.C.-law claims.  Because not all Plaintiffs are geographically diverse with all Defendants, Plaintiffs request that the Court exercise supplemental jurisdiction over their D.C.-law claims.

Plaintiffs' lone federal claim alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, by Wright, Woodruff, Leo A Daly, and Central Properties.  Their D.C. claims consist of tortious interference with prospective economic advantage, abuse of process, malicious

---

[4] Plaintiffs seek to hold both employers liable under principles of *respondeat superior*, alleging that when Wright and Woodruff engaged in the key communications described above, they held themselves out as employees of their firms or used their work email addresses and signature lines.

prosecution, and civil conspiracy by all defendants, and trespass by Woodruff, stemming from his alleged entry onto the properties of 7 Grant Circle and 3223 11th Street NW in June and August 2015.  Defendants have collectively filed four motions to dismiss.  They contend that so-called <u>Noerr-Pennington</u> immunity shields them from liability for petitioning local governmental bodies to establish historic districts and landmarks, and that Plaintiffs have failed to state a claim under the Sherman Act or D.C. law regardless.  The Court held a hearing on the motions on February 5, 2016.

## II.    Standard of Review

On a Rule 12(b)(6) motion for failure to state a claim, a court must assess whether the complaint alleges sufficient facts that, accepted as true, state an entitlement to relief that is "plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  This plausibility standard is less stringent than a "probability requirement" would be.  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  But "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  A complaint's factual allegations must be construed "in the light most favorable to the plaintiff."  <u>Hammel v. Marsh USA Inc.</u>, 79 F. Supp. 3d 234, 238 (D.D.C. 2015).  Yet "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  <u>Harris v. D.C. Water & Sewer Auth.</u>, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting <u>Iqbal</u>, 556 U.S. at 678) (internal quotation marks omitted).  A complaint that presents merely "labels and conclusions" or

"a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

On a motion to dismiss under Rule 12(b)(6), a court may not consider "matters outside the pleadings" without converting the motion to one for summary judgment under Rule 56.  This Court has previously recognized that documents "'incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies,'" should not be considered to be "outside the pleadings." Hicklin v. McDonald, 110 F. Supp. 3d 16, 18–19 (D.D.C. 2015) (quoting Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011)). A court may also consider "documents in the public record of which the court may take judicial notice" without treating a 12(b)(6) motion as one for summary judgment. Tefera v. OneWest Bank, FSB, 19 F. Supp. 3d 215, 220 (D.D.C. 2014) (citing Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).

## III.    Analysis

The Court will address Plaintiffs' Sherman Act claim first, since it provides the sole basis for original federal jurisdiction.[5]  The Court will grant Defendants' motion to dismiss this claim, because Plaintiffs have not adequately alleged that Defendants adversely affected competition in an entire market (or intended to do so).  The remaining claims would be adjudicated entirely under D.C. law.  As explained below, the Court will exercise its discretion to dismiss Plaintiffs' D.C.-law claims without prejudice.

---

[5]  Defendants' Noerr-Pennington defense cannot provide a hook for federal jurisdiction.  In the absence of complete diversity, "federal jurisdiction generally exists 'only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002) (emphasis omitted) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987)).

A.     Plaintiffs' Sherman Act Claim

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Despite (or rather, because of) this provision's extraordinary breadth, the Supreme Court "has never 'taken a literal approach to [its] language.'" Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (alteration in original) (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  Instead, the Court has "long recognized that Congress intended to outlaw only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).

To state a claim under § 1 of the Sherman Act, a plaintiff must allege "(1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to unreasonably restrict trade in the relevant market, which (3) affects interstate commerce." Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 33 F. Supp. 3d 14, 19 (D.D.C. 2014) (quoting Asa Accugrade, Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 215 (D.D.C. 2005)).  The Clayton Act creates an associated cause of action, permitting "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws [to] sue therefor." 15 U.S.C. § 15(a).  For a plaintiff to enjoy "antitrust standing" under the Clayton Act, then, its injury must be "of the type the antitrust laws were intended to prevent" and "flow[] from that which makes defendants' acts unlawful." Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co., 926 F. Supp. 2d 36, 42 (D.D.C. 2013) (quoting Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 862 (D.C. Cir. 2008)).

Importantly, "the antitrust laws 'were enacted for the protection of *competition*, not *competitors*.'" Waka LLC v. D.C. Kickball, 517 F. Supp. 2d 245, 249 (D.D.C. 2007) (quoting Brown Shoe, 370 U.S. at 320).  The Sherman Act forbids "practices that make markets less

12

competitive and thereby hurt the people transacting with the firms in those markets." <u>Muzlou</u>

<u>Television Network, Inc. v. Nat'l Broad. Co.</u>, 603 F. Supp. 677, 683 (D.D.C. 1984).

Accordingly, a civil antitrust plaintiff bears the burden of proving that the defendant's action

targeted, or "had an actual adverse effect on[,] competition as a whole in the relevant market."

<u>Asa Accugrade</u>, 370 F. Supp. 2d at 215.  "[A]bsent injury to competition, injury to plaintiff as a

competitor will not satisfy the pleading requirement."  <u>D.C. Kickball</u>, 517 F. Supp. 2d at 249

(quoting <u>Muzlou Television Network</u>, 603 F. Supp. at 684).  A plaintiff cannot federalize its

private economic injuries "merely by dressing them up in the language of antitrust."  <u>Dial a Car,</u>

<u>Inc. v. Transp., Inc.</u>, 884 F. Supp. 584, 588 (D.D.C. 1995).  Elevating "routine disputes between

business competitors" in this way would "trivializ[e] the [Sherman] Act because of its too ready

availability."  <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d

537, 543 (2d Cir. 1993).

     Courts apply two standards in determining whether a practice unreasonably restrains

trade in violation of § 1.  Some restraints "are deemed unlawful *per se*," <u>Leegin</u>, 551 U.S. at 886

(quoting <u>Khan</u>, 522 U.S. at 10), meaning that they "would always or almost always tend to

restrict competition [in a market] and decrease output," <u>id.</u> (quoting <u>Bus. Elec. Corp. v. Sharp</u>

<u>Elec. Corp.</u>, 485 U.S. 717, 723 (1988)).  This analytical frame is "invoked only in a limited class

of . . . carefully demarcated categories."  <u>Capital Imaging</u>, 996 F.2d at 542–43.[6]  The second test,

the so-called rule of reason, is the "accepted standard for testing whether a practice restrains

trade in violation of § 1."  <u>Leegin</u>, 551 U.S. at 885; <u>see also</u> <u>Asa Accugrade</u>, 370 F. Supp. 2d at

215 (stating that the rule-of-reason standard is "presumptively favored").  Under this approach,

---

[6] *Per se* violations of § 1 include "horizontal and vertical price fixing, division of a market into
territories, certain tying arrangements, and some group boycotts involving concerted refusals to
deal with a competitor."  <u>Capital Imaging</u>, 996 F.2d at 542–43 (citations omitted).

"the factfinder weighs all of the circumstances" in deciding whether a practice unreasonably restrains competition. Leegin, 551 U.S. at 885 (quoting Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977)).

### 1.    Defining the Relevant Market

Until a market's parameters are reasonably well defined, a court cannot know whether a defendant has unreasonably restricted trade in that market.  For this reason, "it is difficult or impossible to determine the plausibility of an antitrust claim if the relevant market is untenably defined." Suture Express, Inc. v. Cardinal Health 200, LLC, 963 F. Supp. 2d 1212, 1222 (D. Kan. 2013).  And "[i]t is the plaintiff's burden to define the relevant market." Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998).  The Court will take up this issue first so that it may fairly assess Plaintiffs' allegations of a marketwide injury to competition.

The purpose of delineating a relevant market is "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." Geneva Pharm. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 496 (2d Cir. 2004).  Very broadly speaking, a market's definition "rests on a determination of available substitutes." Rothgery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 (D.C. Cir. 1986).  A market is defined with reference to a particular product or service and a geographic area, E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011), meaning that "if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume," Rothgery Storage, 792 F.2d at 218 (quoting Lawrence A. Sullivan, Antitrust § 12, at 41 (1977)).

A product market refers to "all 'commodities reasonably interchangeable by consumers for the same purposes.'" Meijer, Inc., 572 F. Supp. 2d at 56.  In other words, "either [good or service] would work effectively," even though "there may be some degree of preference for the one over the other." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997) (quoting Allen-Myland, Inc. v. Int'l Bus. Mach. Corp., 33 F.3d 194, 206 (3d Cir. 1994)). The ultimate inquiry is "whether the amount of actual or potential substitution" of one product or service for another "acted to constrain . . . pricing behavior." Meijer, Inc., 572 F. Supp. 2d at 58. A geographic market is defined as the "area within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output." E.I. du Pont de Nemours, 637 F.3d at 411.  Yet not all products are portable—markets involving goods or services "that can only be offered from a particular location . . . will often be defined by how far consumers are willing to travel." Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc., 101 F. Supp. 3d 1319, 1336 (N.D. Ga. 2015).

For a Sherman Act § 1 claim to survive a motion to dismiss, the proposed market definition "must be plausible." Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 947 F. Supp. 2d 88, 103 (D.D.C. 2013) (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)). Although courts do not require "an economically technical recitation of the market boundaries at the pleading stage," id., an alleged market "'must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes,'" id. (quoting Todd, 275 F.3d at 200). Courts have warned that "failure to define the market by reference to the reasonable interchangeability . . . of services is [a] valid ground for dismissal at the Rule 12(b)(6) stage." Id. (citing Queen City Pizza, 124 F.3d at 436–37).

Plaintiffs' characterizations of the relevant market for antitrust purposes have been imprecise and inconsistent.  They initially alleged that Defendants' actions have adversely affected "competition in the market of D.C. real estate investment and property improvement." Compl. ¶ 113.  In another variation, Plaintiffs describe the relevant market as "property-improvement and/or rentals in the Petworth neighborhood and the District of Columbia."  Id. ¶ 125; see also id. ¶ 128 (limiting "the relevant [geographic] markets" to "the Petworth neighborhood and the District of Columbia").  When offered an opportunity to clarify these characterizations at the motions hearing, Plaintiffs explained that "[t]he antitrust count is focused on the D.C. [geographic] market," Hr'g of Feb. 5, 2016, Prelim. Tr. 4, and that the relevant product market is limited to the "brownstone market[s] both for . . . residential and office entities," id.  The latter delineation is found nowhere in the Complaint, and the Complaint altogether fails to justify its proposed market contours through reference to concepts of reasonable interchangeability and potential substitution.

A number of Plaintiffs' proposed market definitions are simply too broad to plausibly describe a single market.  "Real estate investment," for instance, includes an almost unlimited range of activities related to transactions in real property in all its various forms.  The same is true for "property improvement."  Such indiscriminate monikers are unhelpful in delineating a meaningful product market for federal antitrust purposes.  At the other end of the spectrum, a geographic market limited to the Petworth neighborhood, or a product market limited only to brownstones, would be "unreasonably and implausibly narrow," Allen v. Dairy Farmers of Am., Inc., 748 F. Supp. 2d 323, 328 (D. Vt. 2010), given the sheer unlikelihood that relatively higher real-estate prices or rents in Petworth (or for brownstones) would deter reasonable consumers from considering other D.C. neighborhoods or building types.

In defining the relevant markets, the Court will eschew Plaintiffs' various formulations and be guided by its reading of the Complaint as a whole.   Mr. Gross is described as being in the business of purchasing or investing in properties, renovating them, and then offering them for either sale or rent.  This activity encompasses at least four product markets: (1) the market for purchasing suitable property for renovation; (2) the market for the sale of subsequently renovated property; (3) the rental market for renovated property; and (4) the market for brokerage services in connection with transactions in the foregoing properties.  The Court finds each of these product markets—which, for ease of reading, it will refer to collectively as the "renovation-property market"—to be a plausible one at the 12(b)(6) stage, drawing all inferences in favor of Mr. Gross.  As for the geographic scope of these markets, even without allegations concerning the availability of substitute properties and brokers, the Court finds that it is at least plausible that Washington, D.C. is the approximate "geographic scale on which competition actually occurs" with respect to them.  Sky Angel, 947 F. Supp. 2d at 104.

2.    Selecting an Analytical Framework

Plaintiffs have made no allegations regarding Plaintiffs' or Defendants' market power, presumably because, in their view, Defendants' purportedly anticompetitive activity was unlawful *per se*.  This position appears to conflate two distinct concepts—that certain practices always violate § 1, and that it is sometimes appropriate to lift the immunity shielding conduct that would otherwise be categorically protected by the First Amendment.  The latter concept flows from the doctrine of Noerr-Pennington immunity, which provides that "[w]hen 'a person petitions the government' in good faith, 'the First Amendment prohibits any sanction on that action.'"  Venetian Casino Resort v. NLRB, 793 F.3d 85, 89 (D.C. Cir. 2015) (quoting Nader v. Dem. Nat'l Comm., 567 F.3d 692, 696 (D.C. Cir. 2009)).  But such immunity does not apply

when efforts to influence governmental action are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961).

Plaintiffs cite California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), for the proposition that "sham petitioning is a 'classic example' of antitrust conduct," Pl.'s Opp'n Def. Wright & Woodruff's Mot. Dismiss 28; see also Prelim. Tr. 9 (claiming that sham petitioning "ha[s] been recognized by the Supreme Court as [a] per se" violation of § 1). In that case, a group of highway carriers in California allegedly conspired to "monopolize trade and commerce in the transportation of goods" by instituting proceedings to defeat their competitors' applications to acquire or maintain operating rights. Cal. Motor, 404 U.S. at 509. The defendants sought to "put[] their competitors, including plaintiff, out of business," id. at 511, through a "massive, concerted, and purposeful" effort to "build[] up [their] empire," id. at 515.

After reiterating that use of administrative and judicial processes "does not necessarily give [one] immunity from the antitrust laws," id. at 513, the Court held that "the above-quoted allegations come within the 'sham' exception in the Noerr case," id. at 516. The Supreme Court has since reaffirmed that California Motor's holding was limited to the issue of Noerr-Pennington immunity: "[W]e held that the complaint showed a sham not entitled to immunity" under the facts alleged. Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc., 508 U.S. 49, 58 (1993). To conclude that certain practices are "not immunized" means only that they "may result in antitrust violations." Cal. Motor, 404 U.S. at 513 (emphasis added). The range of "narrow, carefully demarcated" per se antitrust violations, Capital Imaging, 996 F.2d at 543, is not broadened each time otherwise-protected activity becomes subject to the Sherman Act's strictures. As the Supreme Court has explained, "[p]roof of a sham merely deprives the

defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim." Prof'l Real Estate, 508 U.S. at 61. Accordingly, Plaintiffs have not alleged a *per se* Sherman Act violation, and the rule of reason—the "accepted standard for testing whether a practice restrains trade in violation of § 1," Leegin, 551 U.S. at 885—applies to their Sherman Act claim.[7]

     3.  The Complaint's Insufficiency Under the Rule-of-Reason Standard

    Based on the facts alleged, Plaintiffs have not put forth a plausible claim that Defendants either intended to restrain, or actually restrained, trade in the renovation-property market in Washington, D.C. as a whole. Again, "absent injury to competition, injury to plaintiff as a competitor will not satisfy the pleading requirement." D.C. Kickball, 517 F. Supp. 2d at 249 (quoting Muzlou Television Network, 603 F. Supp. at 684). As described in the Background section of this opinion, the Complaint's overarching theme is that "Plaintiffs have been harmed . . . in the form of lost business opportunity" and "inability to realize the full value of their properties." Compl. ¶ 126. Similar characterizations of Defendants' intentions and actions abound. See id. ¶¶ 2, 6 (claiming that "Woodruff and Wright formulated a plan to snuff out Plaintiffs' competing business by . . . attack[ing] Plaintiffs' projects all over the District"); id. ¶ 92 (describing Defendants' "attack on Mr. Gross and his competing businesses"); id. ¶ 101 ("Wright . . . attempted to obstruct Mr. Gross and Plaintiffs' other projects throughout the District."); id. ¶ 112 ("Defendants . . . expanded their plan to properties owned by Plaintiffs throughout the District."); id. ¶124 (summarizing Defendants' efforts "to repress Mr. Gross and

---

[7] Even if the alleged actions in California Motor had been held to constitute a *per se* violation of § 1, Defendants in this case hardly "conspired to monopolize trade and commerce" in a particular market, Cal. Motor, 404 U.S. at 509, nor did they effectively "bec[o]me the regulators" of the issuance of permits and licenses, id. at 511.

Plaintiffs' business" outside Grant Circle); id. ¶ 159 (alleging that Defendants "entered into a confederation . . . [to] unlawfully restrain and interfere with Plaintiffs' business practice").

Plaintiffs do allege that Defendants "both restricted, and demonstrated an intent to restrict, trade in the market of property improvement and/or rentals in . . . the District of Columbia." Id. ¶ 125; see also id. ¶ 113 (asserting that Defendants' "conduct ha[d] . . . [a] destructive effect on competition in the market of D.C. real estate investment and property improvement"). But these are "no more than [legal] conclusions . . . not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Again, a complaint that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not state a claim. Twombly, 550 U.S. at 555.

When pressed at the motions hearing to identify the nature of the harm allegedly inflicted by Defendants' actions, Plaintiffs' counsel acknowledged that "it's simply going out and eliminating a competitor . . . . The antitrust injury is taking out and destroying a competitor"— "they're attacking us wherever we're starting a business." Hr'g of Feb. 5, 2016, Prelim. Tr. 6, 11, 15. The case law is clear, however, that an absence of factual allegations tending to show that the "market as a whole has suffered an anti-competitive injury" is "fatal to . . . Sherman Act claims." Asa Accugrade, 370 F. Supp. 2d at 216. In Asa Accugrade, for example, the plaintiff alleged that the defendants had "diminish[ed] competition in the coin grading and authentication marketplace by removing . . . [plaintiff's] market share and allowing . . . [one competitor] to increase its market share," and that "Defendants' [antitrust] violations . . . have and continue to harm competition." 370 F. Supp. at 216 (second and third alterations in original). The Court held that these two "conclusory statements" could not survive a Rule 12(b)(6) challenge because they were wholly "devoid of factual support." Id.

Here, too, Plaintiffs have "merely allege[d] in bare and conclusory terms the language of the antitrust statute." Id. at 218.  They offer no allegations regarding their or Defendants' respective market shares or the extent to which Gross's elimination from the market would enable Defendants to initiate marketwide price increases.  Nor could they plausibly do so. Competition among property developers in Washington, D.C., and the agents who broker transactions in them, would seem fierce.  Even without knowing Mr. Gross's precise market share, common sense suggests that his elimination from the market would not meaningfully affect the available supply of renovation properties or brokers in the District.  And if that is so, then the Defendants' alleged conduct could not possibly (let alone plausibly) cause an increase in the price of such properties or that of brokerage services to potential buyers and renters.  Put simply, this is not a federal antitrust case.  The Court will therefore dismiss Count I of Plaintiffs' Complaint with prejudice.[8]

### B.    Whether to Exercise Supplemental Jurisdiction

Five D.C.-law claims, but no federal claims, remain in this case after the dismissal of Plaintiffs' Sherman Act count.  Since the parties are not completely diverse, Plaintiffs may not proceed in federal court in the absence of the federal claim unless the Court exercises its discretion to assert supplemental jurisdiction over Plaintiffs' common-law claims.

Under 28 U.S.C. § 1367(a), when a federal district court enjoys either federal-question or diversity jurisdiction over any claim, it generally "ha[s] supplemental jurisdiction over all other

---

[8]  For the same reasons, the Court finds that any attempt to amend the Complaint to state a valid Sherman Act § 1 claim would be futile.  Cf. Mead v. City First Bank of DC, N.A., 256 F.R.D. 6, 7 (D.D.C. 2009) ("Undue delay, undue prejudice to the defendant, or futility of . . . proposed amendments are factors that may warrant denying leave to amend." (citing Fed. R. Civ. P. 15(a); Atchinson v. Dist. of Columbia, 73 F.3d 418, 425 (D.C. Cir. 1996))).

claims that are so related to [that] claim[] . . . that they form part of the same case or controversy under Article III of the United States Constitution."  Nonetheless, a district court "may decline to exercise supplemental jurisdiction over a claim" if the court "has dismissed all claims over which it has original jurisdiction," as occurred here.  Id. § 1367(c)(3).  This is because "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

It is well established that "in the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered"—including "judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Shekoyan v. Sibley Int'l, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)) (internal quotation marks omitted).  This is especially true when "[the] case has not progressed in federal court past Defendant's Motion to Dismiss."  Jones v. D.C. Water & Sewer Auth., 922 F. Supp. 2d 37, 43 (D.D.C. 2013); see also Tonkovich v. Kan. Bd. of Regents, 254 F.3d 941, 945 (10th Cir. 2001) (upholding a district court's dismissal of state-law claims under § 1367(c)(3), "given the relative lack of pretrial proceedings—including a total absence of discovery").  Additionally, "[n]eedless decisions of state law should be avoided both as a matter of comity" and to provide the parties "a surer-footed reading of applicable law."  Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1266 (D.C. Cir. 1995) (quoting Gibbs, 383 U.S. at 726).  After all, "primary responsibility for developing and applying state law rests with the state courts."  Montero v. AGCO Corp., 19 F. Supp. 2d 1143, 1147 (E.D. Cal. 1998).

Here, the factors to be considered counsel dismissal of the remaining D.C.-law claims. This Memorandum Opinion represents the Court's first engagement with the issues in this case;

22

the Court has not even set a timeline for discovery.  There also appears to be an unresolved issue of D.C. law bearing on whether Plaintiffs have stated a claim for abuse of process.  See Tri-State Hosp. Supply Corp. v. United States, Civ. No. 00-01463 (HHK), 2007 WL 2007587, at *10 (D.D.C. July 6, 2007) ("It is not clear whether, under District of Columbia law, an administrative proceeding can be considered a 'process' for purposes of an abuse of process claim.").  The Court expects that resolving Plaintiffs' remaining claims will involve more than rote application of existing precedents in other respects, as well.  For these reasons, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' D.C.-law claims.  It will dismiss Counts II through VI of the Complaint without prejudice, allowing Plaintiffs to refile in the applicable local court should they choose to do so.

IV.   **Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss all counts of Plaintiffs' Complaint.  Count I will be dismissed with prejudice, and Counts II through VI will be dismissed without prejudice.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   May 13, 2016

23